IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

THE VALSPAR CORPORATION and
VALSPAR SOURCING, INC.,

                  Plaintiffs;

     v.

E.I. DU PONT DE NEMOURS AND
COMPANY,

                  Defendant.

Civil Action No. 14-527-RGA

## MEMORANDUM OPINION

Frederick L. Cottrell, III, Esq., Chad M. Shandler, Esq., Jason J. Rawnsley, Esq., Richards, Layton & Finger, P.A., Wilmington, DE; Richard Ihrig, Esq., James M. Lockhart, Esq. (argued), James P. McCarthy, Esq., John C. Ekman, Esq., Jessica L. Meyer, Esq., Lindquist & Vennum LLP, Minneapolis, MN, attorneys for Plaintiffs The Valspar Corporation and Valspar Sourcing, Inc.

Kathleen Furey McDonough, Esq., John A. Sensing, Esq., Potter, Anderson & Corroon LLP, Wilmington, DE; Shari Ross Lahlou, Esq. (argued), Crowell & Moring LLP, Washington, DC; Joshua C. Stokes, Esq., Crowell & Moring LLP, Los Angeles, CA, attorneys for Defendant E.I. du Pont de Nemours and Company.

January 25, 2016

**ANDREWS, U.S. DISTRICT JUDGE:**

Presently before the Court is E.I. du Pont de Nemours and Company's motion for summary judgment. (D.I. 239). The issues have been fully briefed. (D.I. 240, 286, 381). Oral argument was held on November 16, 2015. (D.I. 396). For the reasons set forth herein, the motion for summary judgment is **GRANTED**.

## I.    PROCEDURAL BACKGROUND

Prior to filing suit in this case, Plaintiffs opted out of two separate class actions against the defendants in this case.[1] (D.I. 1). On November 22, 2013, The Valspar Corporation and Valspar Sourcing, Inc. (collectively "Valspar") brought an antitrust action against DuPont, Huntsman International LLC, Kronos Worldwide, Inc., and Millennium Inorganic Chemicals, Inc., for violations of Section 1 of the Sherman Act, along with several state law claims.[2] (D.I. 1). Valspar alleged that DuPont and the other defendants, all suppliers of titanium dioxide (or "TiO2"), conspired to fix the price of titanium dioxide. (*Id.*). The action was originally brought in the District of Minnesota. (*Id.*). Valspar's case against Millennium remains there. *Valspar Corp. v. Millennium Inorganic Chems., Inc.*, No. 13-CV-03214. Valspar's case against Huntsman was severed and transferred to the Southern District of Texas. (D.I. 100). The action against Kronos was also severed and transferred to that court. *Valspar Corp. v. Kronos Worldwide, Inc.*, 50 F. Supp. 3d 1152, 1157-58 (D. Minn. 2014). The case against DuPont was

---

[1] The class action in the Northern District of California (*Los Gatos Mercantile, Inc. v. E.I. DuPont de Nemours & Co.*, 13-cv-13-1180-BLF) is still active. The class action in the District of Maryland ("Maryland Class Action") was dismissed in its entirety following settlement. *In re Titanium Dioxide Antitrust Litig.*, 2013 WL 7389427 (D. Md. Dec. 13, 2013). Notably, this occurred after the court denied the defendants' motion for summary judgment. *See In re Titanium Dioxide Antitrust Litig.*, 959 F. Supp. 2d 799 (D. Md. 2013). It should also be noted that while Tronox was initially a defendant and an alleged co-conspirator in the Maryland case, it later declared bankruptcy. *See In re Titanium Dioxide Antitrust Litig.*, 959 F. Supp. 2d at 802 n.2.

[2] Valspar later agreed to dismiss without prejudice its state law claims. (D.I. 72).

2

severed and transferred to the District of Delaware. (D.I. 100). Following discovery, DuPont moved for summary judgment. (D.I. 239).

## II.   FACTUAL BACKGROUND

Titanium dioxide is a white pigment with certain refractive and UV properties, which makes it useful in certain products including paint and other coatings, plastics, rubber, and paper. (D.I. 250, Ex. 198; D.I. 293, Ex. 199). The market is highly concentrated.[3]  (D.I. 288, Ex. 7 at 97-99, Ex. 11 at 5-12; D.I. 289, Ex. 24 at 4, Ex. 31; D.I. 290, Ex. 35 at 51; D.I. 291, Ex. 75 at 12). DuPont was one of several companies—along with Huntsman, Millennium, Kronos, Tronox, and Asian and European producers—that sold titanium dioxide in the United States during the relevant time period. (D.I. 250, Ex. 206 at 10-12). Valspar, a manufacturer of paints and other coatings, was one of DuPont's largest customers. (D.I. 245, Ex. 74 at 271-72).

Relevant to this case is the existence of the Titanium Dioxide Manufacturers Association ("TDMA") and its associated Global Statistics Program ("GSP"). (D.I. 307, Ex. 701). The TDMA is a trade association organized by a European chemical industry trade association called "CEFIC." (*Id.*). The TDMA established the GSP to collect data on monthly sales, production, and inventory for members of the TDMA. (D.I. 307, Exs. 688, 690; D.I. 308, Ex. 734 at 54-56). This data is aggregated and distributed to the members of the TDMA. (D.I 307, Exs. 688, 690).

In the 1990s and 2000s, the titanium dioxide industry suffered considerable declines in consumption and price. (D.I. 312, Ex. 983 ¶¶ 71-75, figs. 4, 5 & 6; D.I. 297, Ex. 386; D.I. 288, Ex. 16 at 143). Profitability reached an all-time low in 2001. (D.I. 289, Ex. 31 at 40; D.I. 297, Ex. 386). Valspar alleges that because of this decline, DuPont and the other defendants entered

---

[3] The parties agree that the titanium dioxide market is an oligopoly. (*See* D.I. 286 at 13; D.I. 240 at 11). An oligopoly is a market "in which a few relatively large sellers account for the bulk of the output." 2B Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law* 10 (4th ed. 2014).

into a conspiracy to fix prices. (D.I. 286 at 8). Valspar contends that this conspiracy resulted in

31 parallel price increase announcements between 2002 and 2013 (the "Conspiracy Period").

(*Id.* at 8-9). Valspar contends that, as a result of this conspiracy, DuPont and the other

defendants charged an average of 16% more than they would have but for the conspiracy. (*Id.* at

9). Valspar purchased $1.27 billion of titanium dioxide from DuPont and the other defendants in

the period from February 2003 to December 2013. (*Id.*; D.I. 312, Ex. 981 at 10-11). Valspar

contends this resulted in an overcharge to Valspar of $176 million. (D.I. 286 at 9).

## III.   LEGAL STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.

R. Civ. P. 56(a). The moving party has the initial burden of proving the absence of a genuinely

disputed material fact relative to the claims in question. *Celotex Corp. v. Catrett*, 477 U.S. 317,

330 (1986). Material facts are those "that could affect the outcome" of the proceeding, and "a

dispute about a material fact is 'genuine' if the evidence is sufficient to permit a reasonable jury

to return a verdict for the nonmoving party." *Lamont v. New Jersey*, 637 F.3d 177, 181 (3d Cir.

2011) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). The burden on the

moving party may be discharged by pointing out to the district court that there is an absence of

evidence supporting the non-moving party's case. *Celotex*, 477 U.S. at 323.

The burden then shifts to the non-movant to demonstrate the existence of a genuine issue

for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986);

*Williams v. Borough of West Chester, Pa.*, 891 F.2d 458, 460-61 (3d Cir. 1989). A non-moving

party asserting that a fact is genuinely disputed must support such an assertion by: "(A) citing to

particular parts of materials in the record, including depositions, documents, electronically stored

information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials; or (B) showing that the materials cited [by the opposing party] do not establish the absence . . . of a genuine dispute . . . ." Fed. R. Civ. P. 56(c)(1).

When determining whether a genuine issue of material fact exists, the court must view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. *Scott v. Harris*, 550 U.S. 372, 380 (2007); *Wishkin v. Potter*, 476 F.3d 180, 184 (3d Cir. 2007). A dispute is "genuine" only if the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Anderson*, 477 U.S. at 247-49. If the non-moving party fails to make a sufficient showing on an essential element of its case with respect to which it has the burden of proof, the moving party is entitled to judgment as a matter of law. *See Celotex*, 477 U.S. at 322.

## IV.    ANALYSIS

### A. Sherman Act § 1 Legal Standard

Section 1 of the Sherman Act provides: "Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal." 15 U.S.C. § 1. In order to satisfy the requirement of a "contract, combination . . . or conspiracy," there must be "some form of concerted action." *In re Baby Food Antitrust Litig.*, 166 F.3d 112, 117 (3d Cir. 1999). "The existence of an agreement is the hallmark of a Section 1 claim." *Id.*; *see also Alvord-Polk, Inc. v. F. Schumacher & Co.*, 37 F.3d 996, 999 (3d Cir. 1994) (The "very essence of a section 1 claim . . . is the existence of an agreement.").

In addition to demonstrating an agreement, the § 1 plaintiff must show that "the conspiracy to which the defendant was a party imposed an unreasonable restraint on trade."

5

*Toledo Mack Sales & Serv., Inc. v. Mack Trucks, Inc.*, 530 F.3d 204, 218 (3d Cir. 2008). In most

cases, courts "apply the so-called rule of reason, a case-by-case inquiry designed to assess

whether challenged conduct is an anticompetitive practice." *In re Chocolate Confectionary*

*Antitrust Litig.*, 801 F.3d 383, 395 (3d Cir. 2015). Some agreements, however, are *per se*

unlawful once proven. *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 316 (3d Cir. 2010).

One such *per se* unlawful agreement is horizontal price fixing. *Texaco Inc. v. Dagher*, 547 U.S.

1, 5 (2006). In *per se* cases, "the plaintiff need only prove that the defendants conspired among

each other and that this conspiracy was the proximate cause of the plaintiff's injury." *InterVest,*

*Inc. v. Bloomberg, L.P.*, 340 F.3d 144, 159 (3d Cir. 2003).

There is no "special burden on plaintiffs facing summary judgment in antitrust cases."

*Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 468 (1992). There is, however, an

"important distinction" in § 1 cases: "antitrust law limits the range of permissible inferences [that

may be drawn] from ambiguous evidence." *In re Flat Glass Antitrust Litig.*, 385 F.3d 350, 357

(3d Cir. 2004) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 588

(1986)). The "acceptable inferences which can be drawn from circumstantial evidence vary with

the plausibility of the plaintiff's theory and the dangers associated with such inferences."

*Petruzzi's IGA Supermarkets, Inc. v. Darling-Delaware Co.*, 998 F.2d 1224, 1232 (3d Cir. 1993).

Thus, when a plaintiff's theory "makes no economic sense," the plaintiff must produce "more

persuasive evidence." *Flat Glass*, 385 F.3d at 357. Even with a plausible theory, however, "a

plaintiff relying on ambiguous evidence alone cannot raise a reasonable inference of conspiracy

sufficient to survive summary judgment." *In re Chocolate*, 801 F.3d at 396-97. The Supreme

Court has held explicitly that "[c]onduct as consistent with permissible competition as with

illegal conspiracy does not, standing alone, support an inference of antitrust conspiracy."

*Matsushita*, 475 U.S. at 588. Therefore, to survive summary judgment, the plaintiff must present

evidence "'that tends to exclude the possibility' that the alleged conspirators acted

independently." *Id.* (quoting *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 761

(1984)). In the context of a claim alleging a horizontal price fixing conspiracy, the plaintiff must

present "evidence that would enable a reasonable jury to reject the hypothesis that the defendants

foreswore price competition without actually agreeing to do so." *Flat Glass*, 385 F.3d at 368

(quoting *In re High Fructose Corn Syrup Antitrust Litig.*, 295 F.3d 651, 661 (7th Cir. 2002)).

     Courts "have been cautious in accepting inferences from circumstantial evidence in cases

involving allegations of horizontal price-fixing among oligopolists," due to the theory of

"interdependence." *Flat Glass*, 385 F.3d at 358-59. That theory posits that in an oligopolistic

market, "a single firm's change in output or price 'will have a noticeable impact on the market

and on its rivals.'" *In re Chocolate*, 801 F.3d at 397 (quoting *Flat Glass*, 385 F.3d at 359).

Therefore, "any rational decision [by an oligopolist] must take into account the anticipated

reaction of the other firms." *Flat Glass*, 385 F.3d at 359 (quoting Phillip E. Areeda & Herbert

Hovenkamp, *Antitrust Law* 207 (2d ed. 2000)). While the "practice of parallel pricing, known as

'conscious parallelism,' produces anticompetitive outcomes, it is lawful." *In re Chocolate*, 801

F.3d at 397. It is lawful, in part, because it "is not an agreement." *Id.* Put another way,

"[e]xpress collusion violates antitrust law; tacit collusion does not." *In re Text Messaging*

*Antitrust Litig.*, 782 F.3d 867, 872 (7th Cir. 2015); *see also Flat Glass*, 385 F.3d at 362

(acknowledging, in the context of price increases, the distinction between "collusion [that] was

merely interdependent or [that which was] the result of an actual agreement").

     Conscious parallelism cannot by itself "create a reasonable inference of conspiracy." *In*

*re Chocolate*, 801 F.3d at 398. "[P]arallel conduct is 'just as much in line with a wide swath of

rational and competitive business strategy unilaterally prompted by common perceptions of the market.'" *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 321 (3d Cir. 2010) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 554 (2007)). Therefore, when a plaintiff seeks to "bas[e] a claim of collusion on inferences from consciously parallel behavior," the plaintiff is required to show certain "plus factors." *Flat Glass*, 385 F.3d at 360. While there is no exhaustive list of plus factors, the Third Circuit has identified three: "(1) evidence that the defendant had a motive to enter into a price fixing conspiracy; (2) evidence that the defendant acted contrary to its interest; and (3) 'evidence implying a traditional conspiracy.'" *Id.* (quoting *Petruzzi's IGA Supermarkets, Inc. v. Darling-Delaware Co.*, 998 F.2d 1224, 1244 (3d Cir. 1993)). The "require[ment]" of showing plus factors helps to "ensure that courts punish . . . an actual agreement . . . instead of the unilateral, independent conduct of competitors." *Id.* (internal quotation marks omitted).

In cases alleging parallel price increases, however, "the first two factors largely restate the phenomenon of interdependence." *Id.*; *see also In re Chocolate*, 801 F.3d at 398. Therefore, they "may not suffice—by themselves—to defeat summary judgment on a claim of horizontal price-fixing among oligopolists." *Flat Glass*, 385 F.3d at 361. In short, they are "neither necessary nor sufficient to preclude summary judgment." *Id.* at 361 n.12. Accordingly, "[t]he most important evidence will generally be non-economic evidence 'that there was an actual, manifest agreement not to compete.'" *Id.* at 361 (quoting *In re High Fructose Corn Syrup*, 295 F.3d at 661). This is the third plus factor. Evidence satisfying this plus factor "may involve 'customary indications of traditional conspiracy,' or 'proof that the defendants got together and exchanged assurances of common action or otherwise adopted a common plan even though no

meetings, conversations, or exchanged documents are shown.'" *Id.* (quoting Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law* 243 (2d ed. 2000)).

### A. Parallel Conduct

Valspar does not advance any direct evidence of conspiracy.  Instead, Valspar relies on parallel conduct undertaken by DuPont and the other defendants, together with "plus factors." The parallel conduct at issue is parallel pricing.  According to Valspar, DuPont and the other defendants "issued 31 parallel price increase announcements nearly simultaneously, almost always in an identical amount and with identical effective dates." (D.I. 286 at 14; D.I. 312, Ex. 983 at 19-31).  This characterization is generally accurate, with two caveats.  First, "nearly simultaneously" frequently means several days or even weeks apart.  (D.I. Ex. 983 at 19-31). Second, the "almost" in "almost always" is operative, as the total of "31" is reached by counting a number of announcements without identical amounts and with effective dates several days apart.  (*Id.*).

DuPont does not contest the existence of parallel pricing, but instead argues that this conduct "alone is insufficient . . . to support an inference of conspiracy." (D.I. 240 at 9-11). DuPont is correct.  Parallel pricing is obviously important to Valspar's claim, but "an inference of conspiracy" can be drawn only when there are "sufficient other 'plus' factors." *In re Citric Acid Litig.*, 191 F.3d 1090, 1102 (9th Cir. 1999); *see also Flat Glass*, 385 F.3d at 360-61.  Since the price increase announcements may be explained by conscious parallelism, Valspar must be able to show—through plus factors—the existence of "an actual agreement." *Flat Glass*, 385 F.3d at 360; *see also In re Chocolate*, 801 F.3d at 398.

### B. Motive to Enter into Conspiracy

The first "plus factor" articulated by the Third Circuit relates to the motive of the defendant to enter into a price fixing conspiracy. *Flat Glass*, 385 F.3d at 360. DuPont apparently concedes that the market for titanium dioxide is conducive to conspiracy. (D.I. 240 at 23-24; D.I. 396 at 59-60). The market is highly concentrated. (D.I. 288, Ex. 7 at 97-99, Ex. 11 at 5-12; D.I. 289, Ex. 24 at 4, Ex. 31; D.I. 290, Ex. 35 at 51; D.I. 291, Ex. 75 at 12). Titanium dioxide is a standardized commodity-like product. (D.I. 290, Exs. 36, 50-52, 58 at 87; D.I. 291, Ex. 59 at 5). There are no viable substitutes. (D.I. 289, Ex. 31 at 37; D.I. 290, Ex. 34 at 13, Ex. 35 at 51). There are substantial barriers to entry. (D.I. 289, Ex. 19 at 6; D.I. 292, Ex. 113). DuPont also does not dispute that the market conditions prior to the Conspiracy Period provided DuPont with a motive to enter into a conspiracy. (D.I. 240 at 23-24; D.I. 396 at 59-60). Prior to the Conspiracy Period, the demand for titanium dioxide declined, which resulted in a concomitant decline in prices. (D.I. 312, Ex. 983 ¶¶ 71-75, figs. 4, 5 & 6). Such market conditions made "price competition more than usually risky and collusion more than usually attractive." *See In re High Fructose Corn Syrup Antitrust Litig.*, 295 F.3d 651, 657 (7th Cir. 2002). Indeed, in the Maryland Class Action, the court concluded that these conditions amounted to "a text book example of an industry susceptible to efforts to maintain supracompetitive prices." *In re Titanium Dioxide Antitrust Litig.*, 959 F. Supp. 2d 799, 827 (D. Md. 2013) (quoting *Flat Glass*, 385 F.3d at 361). I therefore conclude that the market for titanium dioxide was conducive to conspiracy and that DuPont had a motive to enter into such a conspiracy. As articulated above, however, evidence of motive "does not create a reasonable inference of concerted action because it merely restates interdependence." *In re Chocolate*, 801 F.3d at 398; *see also Flat Glass*, 385 F.3d at 361; *In re Baby Food Antitrust Litig.*, 166 F.3d 112, 122 (3d Cir. 1999).

## C. Actions Contrary to Interest

The second "plus factor" that may indicate an agreement is "evidence that the defendant acted contrary to its interests." *Flat Glass*, 385 F.3d at 360. When assessing this factor, a court looks for "evidence of conduct that would be irrational assuming that the defendant operated in a competitive market," or "[p]ut differently, . . . 'evidence that the market behaved in a noncompetitive manner.'" *Id.* at 360-61 (quoting *In re High Fructose Corn Syrup*, 295 F.3d at 655).

Here, Valspar points to several types of evidence that it argues satisfy this plus factor. Valspar contends that the market shares of the titanium dioxide manufacturers remained static, that defendants raised prices without correlated changes in the market, and that the defendants made inter-company sales at nonmarket prices. (D.I. 286 at 17-19). Each category of evidence is addressed separately below.

Valspar contends that the market shares of the titanium dioxide producers remained relatively stable—despite some shifts from year-to-year—during the Conspiracy Period. (D.I. 303, Ex. 584 at 51-55; D.I. 313, Ex. 985 ¶¶ 174-84). Using the same evidence, DuPont argues that there were significant shifts in overall market shares throughout the Conspiracy Period. (D.I. 381 at 11-12). The undisputed evidence shows that DuPont's share fluctuated between 27% and 35%; Millennium's between 15% and 22%; Kronos's between 14% and 20%; and Huntsman's between 7% and 10%. (D.I. 313, Ex. 985 at 102). Even granting that Valspar's interpretation of stability is correct, this is entirely consistent—according to Valspar's own expert—with market shares in a concentrated, oligopolistic market. (D.I. 248, Ex. 109 ¶¶ 177-79). Therefore, even accepting Valspar's view, this fact does not support an inference of conspiracy.

In arguing that the price increases were not correlated with the market or "to supply-and-demand principles," Valspar relies on its expert, who opines that, by raising prices, DuPont overcharged Valspar by an average of 16% during the Conspiracy Period. (D.I. 286 at 18-19; D.I. 312; Exs. 981 at 10, 982). Dr. McClave asserts that this overcharge has no non-collusive explanation. (D.I. 286 at 18-19; D.I. 312; Exs. 981 at 10, 982). The 16% figure is based on the average overcharge during the damages period of 2003 to 2013. (D.I. 312, Ex. 981 at 6). DuPont argues against the existence of an overcharge, but for purposes of this motion, does not dispute Dr. McClave's model or his conclusion that there was an overcharge. (D.I. 240 at 35 n.114).

"[A]bsent increases in marginal cost or demand, raising prices generally does not approximate—and cannot be mistaken as—competitive conduct." *Flat Glass*, 385 F.3d at 358. While raising prices cannot be mistaken as competitive conduct, it does not necessarily follow that raising prices is evidence of an agreement. A "firm's motivation . . . to meet rival prices . . . constitute[s] only interdependence." *In re Baby Food*, 166 F.3d at 135; *see also White v. R.M. Packer Co.*, 635 F.3d 571, 586 (1st Cir. 2011) ("One does not need an agreement to bring about this kind of follow-the-leader effect in a concentrated industry." (quoting *Clamp-All Corp. v. Cast Iron Pipe Inst.*, 851 F.2d 478, 484 (1st Cir. 1988))). For parallel pricing to go "beyond mere interdependence," it "must be so unusual that in the absence of an advance agreement, no reasonable firm would have engaged in it." *In re Baby Food*, 166 F.3d at 135. Here, the evidence is entirely consistent with interdependent behavior. Nothing about the parallel price increase announcements is "so unusual" that "no reasonable firm would have engaged in it." *Id.* Indeed, "oligopolists may maintain supracompetitive prices through rational, interdependent decision making, as opposed to unlawful concerted action, if the oligopolists independently

12

conclude that the industry as a whole would be better off by raising prices." *In re Chocolate Confectionary Antitrust Litig.*, 801 F.3d 383, 397 (3d Cir. 2015). "[E]vidence of a price increase disconnected from changes in costs or demand only raises the question: was the anticompetitive price increase the result of lawful, rational interdependence or of an unlawful price-fixing conspiracy?" *Id.* at 400. Dr. McClave's opinion, by itself, therefore cannot raise an inference of conspiracy. As the Supreme Court has advised, "[e]xpert testimony is useful as a guide to interpreting market facts, but it is not a substitute for them." *Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 242 (1993).

Valspar argues that evidence of inter-company sales at nonmarket prices is evidence of conduct contrary to self-interest. (D.I. 286 at 19). Valspar's expert, Dr. Williams, argues that these sales are evidence of conspiracy because they could be "true-ups." (D.I. 247, Ex. 106 ¶¶ 100-01). That is, they could be redistributions of gains or losses in share in accordance with the terms of an agreement. (*Id.*). Additionally, Dr. Williams opines that "if one seller buys anything from another at nonmarket prices, then a resource transfer is made for which there is no reasonable noncollusive explanation." (D.I. 247, Ex. 106 ¶¶ 101-02 (quoting William E. Kovacic et al., *Plus Factors and Agreement in Antitrust Law*, 110 Mich. L. Rev. 393, 423 (2011))). Throughout the Conspiracy Period, DuPont and the other defendants made inter-company sales at below-market prices. (D.I. 312, Ex. 983 at 67-76; D.I. 298-303, Exs. 476-579). It is undisputed that these sales existed; however, that does not advance Valspar's ball very far. These sales are just as consistent with non-collusive activity as with conspiracy. For instance, DuPont's purchases in 2005 and 2006 were made by DuPont's manufacturing business, which used titanium dioxide in its own products. (D.I. 248, Ex. 108 ¶¶ 194-209). Dr. Williams expressly concedes that the purchases made by DuPont during this period "might be explained

by DuPont's temporary decrease in capacity due to its DeLisle plant being shut down from September 2005 through February 2006 following Hurricane Katrina." (D.I. 247, Ex. 106 ¶ 103 n.157; *see also* D.I. 248, Ex. 108 ¶¶ 194-209). Dr. Williams also acknowledges that DuPont's purchases prices were sometimes higher and sometimes lower than the average prices for non-defendants. (D.I. 247, Ex. 106 at 64-75). Further, it is undisputed that the sales from DuPont to Kronos were largely attributable to a cross-licensing agreement reached to avoid litigation.[4] (D.I. 250, Exs. 188, 189, 204). From 2006 to 2008, the price was set by the agreement. (D.I. 250, Ex. 188 at 7-8). Thereafter, DuPont repeatedly negotiated to increase the price. (D.I. 250, Exs. 190-93, 197, 199-205). Even putting aside these non-collusive explanations, Dr. Williams acknowledged that while he had not "calculated how the shares would change given the volumes of intercompany sales . . ., [m]any of the sales [were] relatively small volumes . . . [and therefore he would not] expect that they would have resulted in large share shifts." (D.I. 382, Ex. 4 at 25-26). This concession undermines the entire theory of "true-ups." Therefore, these intercompany sales, which are consistent with a firm's independent interest, fail—under the theory advanced by Dr. Williams—to be probative of conspiracy. In short, these transfers had "productive unilateral motivations" and therefore do not tend to exclude the possibility of independent action. (D.I. 247, Ex. 106 ¶ 101 (quoting William E. Kovacic et al., *Plus Factors and Agreement in Antitrust Law*, 110 Mich. L. Rev. 393, 423 (2011))).

Valspar has presented sufficient evidence to show that the titanium dioxide market "behaved in a noncompetitive manner." *In re High Fructose Corn Syrup Antitrust Litig.*, 295

---

[4] Dr. Williams relies heavily on Professor Kovacic's article for this part of his opinion. In the section upon which Dr. Williams relies, Professor Kovacic himself notes: "Other transactions require scrutiny, such as patent licensing, cross-licensing, and patent pools, as well as the settlement of seemingly frivolous lawsuits." William E. Kovacic et al., *Plus Factors and Agreement in Antitrust Law*, 110 Mich. L. Rev. 393, 423 (2011).

F.3d 651, 655 (7th Cir. 2002). Despite that showing, however, "the evidence does not go beyond interdependence and therefore does not create an inference of conspiracy." *In re Chocolate Confectionary Antitrust Litig.*, 801 F.3d 383, 401 (3d Cir. 2015). This is not surprising, as in cases of parallel pricing, "the first two [plus] factors largely restate the phenomenon of interdependence." *In re Flat Glass Antitrust Litig.*, 385 F.3d 350, 360 (3d Cir. 2004).

### D. Evidence Implying a Traditional Conspiracy

In cases involving oligopolists and parallel pricing, the most important plus factor is the third: evidence implying a traditional conspiracy. *Id.* at 361. This evidence has been characterized as "non-economic evidence 'that there was an actual, manifest agreement not to compete.'" *Id.* (quoting *In re High Fructose Corn Syrup*, 295 F.3d at 661). Such evidence "may involve 'customary indications of traditional conspiracy,' or 'proof that the defendants got together and exchanged assurances of common action or otherwise adopted a common plan even though no meetings, conversations, or exchanged documents are shown.'" *Id.* (quoting Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law* 243 (2d ed. 2000)).

To satisfy this plus factor, Valspar relies on four general categories of evidence. First, Valspar argues that the Global Statistics Program provided DuPont and the other defendants an opportunity both to share information and to conspire to fix prices. Second, Valspar contends that DuPont and the other defendants engaged in price signaling through the use of, among other things, price increase announcements. Third, Valspar argues that certain email communications are circumstantial evidence from which the Court can infer the existence of an agreement. Fourth, Valspar argues that, due to an agreement, DuPont and the other defendants departed from their pre-conspiracy conduct by issuing numerous parallel price increase announcements. These categories of evidence are addressed separately below.

15

### 1. Global Statistics Program

Valspar contends that the "GSP was a means by which the defendants shared sensitive information and coordinated price increases." (D.I. 286 at 20-21). In September 2001, the TDMA's General Committee established the GSP to collect data on monthly sales, production, and inventory. (D.I. 308, Ex. 734 at 54-55). The data was then aggregated on a regional and country-by-country basis, and returned to the members of the TDMA on a monthly and quarterly basis. (D.I. 249, Ex. 183 at 16, Ex. 185 at 29-36; D.I. 242, Ex. 13 at 305-06; D.I. 307, Ex. 690). The TDMA sought DuPont's membership in the TDMA (and the GSP), because in the absence of DuPont's data, the aggregated GSP data would not be meaningful. (D.I. 249, Ex. 182). In January 2002, the TDMA amended its rules in order to admit DuPont as an Associate Member of the TDMA. (D.I. 307, Ex. 712 at 132-33). In September 2002, DuPont was approved as an Associate Member. (D.I. 307, Ex. 701 at 68).

The data reported by the GSP gave the defendants "a very powerful and timely over view [sic] of market supply (production) and demand (region, country, market segment) conditions." (D.I. 306, Ex. 638 at 7). It permitted the defendants to determine "market share developments by country and region, amount and location of inventory, inventory relative to industry, industry trends, and capacity additions." (D.I. 286 at 22; D.I. 330, Ex. 1341 at 28-30).

Valspar contends that "[t]he defendants were able to disaggregate the data to better track individual firm inventories, market share, and capacity utilization." (D.I. 286 at 22; D.I. 396 at 47-48). The evidence provided by Valspar does not support this conclusion. The email—relied upon by Valspar—from Huntsman marketing analyst Paul Bradley, indicates that Huntsman could determine a production total in aggregate of Kronos (within Canada), Millennium (within Brazil), and DuPont (within Brazil and Mexico). (D.I. 307, Ex. 678 at 24). This could be

achieved by subtracting the USA production totals from the North and South America

production totals. (*Id.*). There is nothing in the record that suggests that DuPont or any other

defendant could determine any individual statistics about any firm other than their own. Indeed,

Valspar's expert Dr. Williams conceded precisely this in his deposition. (D.I. 382, Ex. 4 at 28-

29).

Nothing about the sharing of aggregated information suggests the existence of a

conspiracy. Participation in the GSP is properly characterized as "[c]onduct as consistent with

permissible competition as with illegal conspiracy." *Matsushita Elec. Indus. Co. v. Zenith Radio

Corp.*, 475 U.S. 574, 588 (1986). This was not an exchange of firm-specific information

between competitors. It was historical, aggregated market statistics, which firms could use to

analyze their position within the market. (D.I. 249, Ex. 183 at 16, Ex. 185 at 29-36; D.I. 242, Ex.

13 at 305-06; D.I. 307, Ex. 690). As such, it is directly analogous to the program at issue in *In re

Citric Acid Litig.*, 191 F.3d 1090 (9th Cir. 1999), which the court described as one which

"collected figures on production and sales from its members . . . and produced statistics

aggregated by country" to its members. *Id.* at 1099. There, the Ninth Circuit found that there

was no evidence that any firm had access to firm-specific information of other members. *Id.*

The court concluded that the program had a "perfectly legal" and "legitimate" purpose and

therefore was "as consistent with legitimate behavior as with conspiratorial behavior." *Id.* I

conclude the same is true here.

Valspar also contends that during the period of 2002 to 2010, "the vast majority of the

price increase announcements occurred within 30 days of a General Committee meeting of the

TDMA." (D.I. 286 at 24). This demonstrates, according to Valspar, that "the defendants used

the TDMA meetings to communicate their pricing plans, coordinate price increases, and confirm

that each competitor would follow the leader on a price increase." (D.I. 386 at 24). The mere

fact that there were communications between DuPont and the other defendants at TDMA

meetings[5] does not, without more, raise an inference of conspiracy. *In re Baby Food Antitrust*

*Litig.*, 166 F.3d 112, 126 (3d Cir. 1999) ("[C]ommunications between competitors do not permit

an inference of an agreement to fix prices unless 'those communications rise to the level of an

agreement, tacit or otherwise.'" (quoting *Alvord-Polk, Inc. v. F. Schumacher & Co.*, 37 F.3d 996,

1013 (3d Cir. 1994))). There is no evidence that there was any discussion of prices during these

meetings and certainly no evidence of an agreement. In short, evidence "that the executives

from the [industry] were in the same place at the same time . . . is insufficient to support a

reasonable inference of" conspiracy. *In re Chocolate Confectionary Antitrust Litig.*, 801 F.3d

383, 409 (3d Cir. 2015). Valspar's argument about the temporal proximity of price increases in

relation to TDMA meetings fares no better. In arriving at the stated "vast majority" of

announcements, Valspar includes any announcements that occurred within 30 days *before or*

*after* a General Committee meeting of the TDMA. (D.I. 247, Ex. 106 at 404; D.I. 286 at 24; D.I.

396 at 13). Since the meetings of the TDMA General Committee occurred quarterly, Valspar's

logic would find suspect any announcement which occurred in eight out of twelve months. (D.I.

247, Ex. 106 at 404; D.I. 286 at 24; D.I. 396 at 13). This proves too much. Further, Valspar

supplies no explanation as to how announcements occurring *before* a TDMA General Committee

---

[5] It is undisputed that DuPont did not actually attend the General Meetings of the TDMA until 2010.
(D.I. 242, Ex. 7 at 159; D.I. 245, Ex. 70 at 181-82; D.I. 396 at 11-12). Valspar states that this is
immaterial, as DuPont attended other CEFIC meetings which were concurrent with the General Meetings.
(D.I. 396 at 11-2; *see also* D.I. 249, Exs. 179-81). The Court will assume, for purposes of this motion,
that DuPont and the other defendants were at quarterly CEFIC meetings of some sort—and therefore were
capable of communicating with each other in person—even though DuPont did not attend the General
Meetings.

meeting could give rise to an inference that the meeting provided an opportunity to conspire about a subsequent price announcement.

Therefore, Valspar's evidence pertaining to the Global Statistics Program and the TDMA cannot raise a reasonable inference of conspiracy.

2. *Signaling Price Announcements*

Valspar proposes that the various price announcements issued by DuPont and the other defendants were "price beacons to competitors for the purpose of gauging their willingness to raise prices." (D.I. 286 at 25-26 (quoting *In re Currency Conversion Fee Antitrust Litig.*, 773 F. Supp. 2d 351, 371 (S.D.N.Y. 2011)). Consistent with this theory, the court in the Maryland Class Action concluded that "[f]requent price increase announcements could have served as 'signals,' making further exchange of actual price information superfluous." *In re Titanium Dioxide Antitrust Litig.*, 959 F. Supp. 2d 799, 828 (D. Md. 2013).

In further support of its signaling theory, Valspar cites to a presentation and several internal emails exchanged within the ranks of the defendant manufacturers. In one email, in September 2009, DuPont's North American Marketing Manager for Titanium Technologies Lloyd Sommers wrote:

> With our recent prices increases, we've begun the process of 'training' our competitors to follow our lead on price increases (or, in one example, that we'll follow if they lead). From a testing perspective, it may be valuable to make the October announcement. If our competitors do follow, it sends a clear message to us that they are receiving/understanding our price increase messages. (D.I. 308, Ex. 770 at 55).

In another email, in July 2009, DuPont's Colette Daney remarked that a price increase "could help with messaging in the market place."[6] (D.I. 295, Ex. 297 at 16). A 2004 email from

---

[6] The two 2009 DuPont emails seem, to put it charitably, inconsistent with the idea that DuPont had agreed to fix prices seven years earlier.

Millennium's Tim Edwards suggested that an October 1st announcement date was "a bit early," while an announcement on November 1st would give "others [a] chance to get on their horses." (D.I. 298, Ex. 462). A 2008 email from a Millennium employee attached a Huntsman price increase and indicated that "[e]veryone is now on the bus." (D.I. 296, Ex. 344). On September 14, 2004, a Millennium email stated: "we have competition on board for the Oct 1 price increase announcement."[7] (D.I. 298, Ex. 436). In a strategic pricing presentation in 2007, DuPont noted in a slide titled "Lessons Learned," that in regard to "Price Leadership and Market Messaging," "[o]ur behavior, and how it is perceived, has a major impact on marketplace dynamics and pricing." (D.I. 292, Ex. 93 at 36). In October 2008, Thomas Cerny of Kronos stated: "We must not give a signal to the competition with lower prices now . . . ."[8] (D.I. 298, Ex. 407).

Valspar's characterization of this evidence largely neglects the theory of interdependence, as well as the distinction between tacit and express collusion. As stated earlier, in an oligopoly setting, "any single firm's 'price and output decisions will have a noticeable

---

[7] Contrary to Valspar's urging at oral argument, there is no nefarious inference of prior knowledge that can be derived from this communication. (D.I. 396 at 62-63). This conversation occurred *after* not only Millennium's announcement, but also the announcements from DuPont, Huntsman, and Kronos. (D.I. 247, Ex. 106 at 400).

[8] This is how the quote appears in Valspar's brief. (D.I. 286 at 25). The context is important, however. Mr. Cerny wrote this email in response to one from Kronos executive Joe Maas, where Mr. Maas informed Mr. Cerny that the Israeli paint company Tambour asked for a reduction in price for titanium dioxide. (D.I. 298, Ex. 407). Mr. Maas thought Kronos should comply and "take [that] business unless it [would] really [have] an adverse pricing impact in the market." (*Id.*). In response, Mr. Cerny stated that "such decisions [would] have an adverse impact on prices," and that prices were higher in the Near East "as a result of significant price increases having been implemented by competition." (*Id.*). Mr. Cerny went on to state that Kronos should not lower prices for Tambour, as that would thereby "give a signal to competition" about Kronos' "bidding . . . for the ENAP business." (*Id.*). This email, as a whole, is thus best understood as one in which Kronos—knowing how its decisions may affect the market—sought to avoid providing its competitors with information about its activities. Therefore, not only does this email fail to support a nefarious inference of conspiracy, it clearly shows a perfectly legitimate, competitive interest. The Cerny excerpt is characteristic of many of the statements to which Valspar cites in support of its theory. That is, divorced from context, the quote is ambiguous. In context, the quote is not ambiguous. Instead, it can only be read as probative of "legitimate behavior." *See In re Citric Acid Litig.*, 191 F.3d 1090, 1099 (9th Cir. 1999).

impact on the market and its rivals.'" *In re Flat Glass Antitrust Litig.*, 385 F.3d 350, 359 (3d Cir. 2004) (quoting Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law* 206 (2d ed. 2000)). As a result, "oligopolists may maintain supracompetitive prices through rational, interdependent decision making, as opposed to unlawful concerted action, if the oligopolists independently conclude that the industry as a whole would be better off by raising prices." *In re Chocolate Confectionary Antitrust Litig.*, 801 F.3d 383, 397 (3d Cir. 2015); *see also In re Text Messaging Antitrust Litig.*, 782 F.3d 867, 871 (7th Cir. 2015) ("'[F]ollow the leader' pricing ('conscious parallelism,' as lawyers call it, 'tacit collusion' as economists prefer to call it) . . . means coordinating . . . pricing without an actual agreement to do so."); *White v. R.M. Packer Co.*, 635 F.3d 571, 586 (1st Cir. 2011) ("One does not need an agreement to bring about this kind of follow-the-leader effect in a concentrated industry." (quoting *Clamp-All Corp. v. Cast Iron Pipe Inst.*, 851 F.2d 478, 484 (1st Cir. 1988))).   DuPont and the other defendants had lawful, non-collusive reasons for making public price announcements. The price announcements here served several purposes, including the satisfaction of a "contractual condition" to provide "some formal notification" to customers and the assurance to customers that announced prices (the starting point for negotiations) were raised as to *all* customers.  (D.I. 382, Ex. 1 at 4-6, Ex. 3 at 16-18). Valspar's expert concedes that there are lawful non-collusive reasons for a firm to make public price announcements.  (D.I. 382, Ex. 4 at 22-24).  Even in the absence of these explanations, the parallel rises in price following a firm's announcement "may not be because they've agreed not to compete but because all of them have determined independently that they may be better off with a higher price." *In re Text Messaging*, 782 F.3d at 871.   That this occurred over a long period of time is not surprising.  In a concentrated market with high barriers to entry, "a higher price generating higher profits will not be undone by the output of new entrants." *Id.* at 872.

Even if a new entrant caused a drastic fall in prices "that would deny them the profits [they sought to obtain] from having entered," "that drastic fall could well be the result of parallel but independent pricing decisions by the incumbent firms, rather than of agreement." *Id.*

Valspar cannot "proceed by first assuming a conspiracy and then setting out to prove it." *Blomkest Fertilizer, Inc. v. Potash Corp. of Saskatchewan*, 203 F.3d 1028, 1037 (8th Cir. 2000). These parallel price increases, or "signals," would perhaps describe how a conspiracy practically functioned, but only if there were there some indication of an agreement to begin with, rather than conduct that could just as well be explained by independent action. In short, nothing about these announcements tends to exclude the possibility of independent action. Importantly, the "dissemination of price information is not itself a *per se* violation of the Sherman Act." *United States v. Citizens & S. Nat'l Bank*, 422 U.S. 86, 113 (1975). Were it any other way, any evidence of lawful interdependence would also necessarily be evidence of actionable conspiracy. Despite Valspar's labeling of these announcements as "signals," it has presented no evidence that "tend[s] to exclude the possibility that the primary players in the . . . [market] were engaged in rational, lawful, parallel pricing behavior that is typical of an oligopoly." *Williamson Oil Co., Inc. v. Philip Morris USA*, 346 F.3d 1287, 1310 (11th Cir. 2003).

### 3.  *Other Email Communications*

Valspar contends that certain emails from individuals, employed by DuPont and the other defendants, evince the existence of an agreement. Valspar repeatedly referenced these emails throughout its brief and in oral argument. The emails, however, suffer from many of the same flaws as the other evidence advanced by Valspar. That is, they are just as consistent with oligopoly as they are with conspiracy.

22

Several emails relate to market share. For instance, in 2007, Millennium executive John Hall advised that Millennium should "[b]e disciplined, keep our volume, do not take others." (D.I. 311, Ex. 937 at 47). Also in 2007, Michael Card of Millennium stated: "Our share YTD is 20%, and our historical and sustainable share is 21%. The 1% represents approx. 8000MT analyzed sales we are not getting. We should have this extra share - customers have been and want to buy this from us. Competitors will let us have this." (D.I. 309, Ex. 816 at 192). A 2002 email from a Kronos employee, when discussing volume, stated: "I assume we still have SP to sell. The SP approved is 2090. Probably will be only 500st to start as this will not disrupt DUP." (D.I. 298, Ex. 456 at 59).

Other emails pertain to price increases. For instance, DuPont executive Ian Edwards wrote in 2006 that Millennium's and Huntsman's "reading of the CEFIC info like ours should give them confidence that NA price increases can be prosecuted despite the flat market in [North America] itself." (D.I. 306, Ex. 657). In March 2009, as "North American and Western European demand is decreasing," a DuPont executive commented, "[c]ustomers will ask why their 4Q price has not decreased or why they have not seen a price decrease this year." (D.I. 310, Ex. 861).

Valspar also cites to emails that refer to industry "discipline" and "collective needs." (D.I. 286 at 28). For instance, in 2002, Millennium executive David Vercollone told other Millennium employees that the GSP would "be the best opportunity we have in structuring industry data for all of our collective needs."[9] (D.I. 308, Ex. 746 at 22). In a 2001 strategic development presentation, Millennium wrote—in a slide called "TiO2 Industry Trends"—

---

[9] It is clear from context that "our collective needs" refers to Millennium's needs, not the needs of Millennium and its competitors. Mr. Vercollone uses the phrase after separately asking four Millennium employees whether the statistics would meet their individual needs.

"Possibly more industry discipline on pricing and capacity." (D.I. 304, Ex. 621, Part 1, at 8). In the minutes to a 2012 Millennium meeting, an entry states: "There is usually good discipline in our industry, however, Kronos were the first to break discipline and begin to sell in markets they don't usually sell in." (D.I. 303, Ex. 593 at 75).

These statements, while evidencing a noncompetitive market, do not tend to exclude the possibility of independent action. These emails are similar to those in *In re Text Messaging* because there is no indication that any author or recipient "believed there was a conspiracy among the [defendants]." *In re Text Messaging Antitrust Litig.*, 782 F.3d 867, 873 (7th Cir. 2015). Contrary to Valspar's interpretation, these emails—along with the others referenced by Valspar in their brief and during oral argument—actually suggest the absence of an agreement. The employees of DuPont and the other defendants repeatedly emphasize their lack of assurance as to what the other players in the industry were doing or were intending to do. For instance, the phrase "reading of the CEFIC info like ours should give them confidence" suggests an awareness of how other firms might act, but not an express agreement. (*See* D.I. 306, Ex. 657). DuPont and the other defendants relied on the Global Statistics Program to gain information about the state of the market and competition. This information was used to "make better business decisions." (D.I. 308, Ex. 746). It appears that, in making those decisions, DuPont and the other defendants undertook actions that could plausibly be interpreted as "collusive." (*See* D.I. 311, Ex. 937 at 47). That is not by itself sufficient, however, as there is a "fundamental distinction between express and tacit collusion:" while "[e]xpress collusion violates antitrust law[,] tacit collusion does not." *In re Text Messaging*, 782 F.3d at 867; *see also In re Chocolate Confectionary Antitrust Litig.*, 801 F.3d 383, 398, 400 (3d Cir. 2015); *In re Flat Glass Antitrust Litig.*, 385 F.3d 350, 362 (3d Cir. 2004). The same distinction is important when interpreting

24

terms that refer to the industry generally.  In an oligopoly, it may be in a firm's best interest to consider the interests and needs of the industry as a whole.  "[O]ligopolists [may] independently conclude that the industry as a whole would be better off by raising prices." *In re Chocolate*, 801 F.3d at 397; *see also In re Text Messaging*, 782 F.3d at 871.  Tacit collusion, however, does not suggest an agreement.

The communications at issue here are markedly different from those found sufficient to survive summary judgment in cases like *Petruzzi's IGA Supermarkets, Inc. v. Darling-Delaware Co.*, 998 F.2d 1224 (3d Cir. 1993) and *In re High Fructose Corn Syrup Antitrust Litig.*, 295 F.3d 651 (7th Cir. 2002).  In *Petruzzi's*, a witness testified that a defendant "followed a 'code' in not soliciting the accounts of other renderers." *Petruzzi's*, 998 F.2d at 1233-34.  A taped conversation revealed that a defendant firm's executive stated: "You're not playing." *Id.* at 1235-36.  The Third Circuit found that the reasonable inference there was that this was an "attempt[] to get [someone] to play by the rules." *Id.*  In *High Fructose Corn Syrup*, employees made the following statements, among others: "[w]e have an understanding within the industry not to undercut each other's prices" and "our competitors are our friends. Our customers are the enemy." *In re High Fructose Corn Syrup*, 295 F.3d at 662.  Further, an executive stated that "*every business* [he was] in [was] an organization," and in context, "it appear[ed] that 'organization' meant price-fixing conspiracy." *Id.*  In these cases, the evidence tended to exclude the possibility of independent action.  There were references to some sort of explicit agreement between competitors.  Here, that is absent.

Valspar further contends that communications involving industry consultants Jim Fisher and Gary Cianfichi "demonstrate [that] these consultants served as conduits in the price-fixing conspiracy." (D.I. 286 at 29).  In support of this assertion, Valspar points to numerous

documents.  Some documents show the sharing of information between Jim Fisher and Gary

Cianfichi.  For instance, in 2003, Mr. Cianfichi asked Mr. Fisher: "Are global TiO2 inventories

modest, normal, high - steady or growing at Dup, KMG, Kronos, HT? . . . . Directional views

with a few numbers on inventory if you can get them would be appropriate."  (D.I. 319 Ex. 1058;

*see also* Exs. 1056-57).  Other communications show that Jim Fisher gave advice to Kronos

executive Joe Maas:

> Jim, according [to] the Cefic production data and your estimate of capacity shutdowns
> ww . . ., the capacity utilization rates could be in the mid 90's which is a prescription for
> prices to move up!. I know this is missing non Cefic production and demand but cefic is a
> big chunk of the business. Do you buy this story??  (D.I. 320, Ex. 1075; *see also* Exs.
> 1074, 1076).

Other emails indicate that DuPont regularly relied on the advice of Jim Fisher.  (*See, e.g.*, D.I.

319, Exs. 1026, 1028-29, 1031-33).  In its brief, Valspar—without much discussion—cites to

many more documents pertaining to Mr. Fisher and Mr. Cianfichi.  (D.I. 298 at 30 n.19).

None of these cited communications support an inference of conspiracy.  Valspar's

theory amounts to an assertion that the consultants could have been an avenue whereby DuPont

and the other defendants shared information pursuant to a conspiracy.  That does not make the

usage of consultants suggestive of conspiracy, nor does it tend to exclude the possibility of

independent action.  It defies common sense to suggest that there is no non-collusive purpose to

retain consultants.  Much of the cited evidence has little, if anything, to do with the activities of

competitors within the industry.   Further, to the extent that the consultants did help one

competitor gather information on another, this is certainly within a firm's unilateral self-interest.

Indeed, "to keep tabs on the commercial activities of [one's] competitors" is "economically

beneficial." *Williamson Oil Co., Inc. v. Philip Morris USA*, 346 F.3d 1287, 1313 (11th Cir.

2003). Therefore, the use of these consultants to gather information "does not tend to exclude the possibility of independent action or to establish anticompetitive collusion." *Id.*

### 4. *Departure from Pre-Conspiracy Conduct*

Valspar argues that the parallel price increase announcements increased in frequency during the Conspiracy Period. (D.I. 286 at 14-17; D.I. 312, Ex. 983 ¶¶ 87-89, figs. 7, 8; D.I. 313, Ex. 985 ¶ 69, fig. 5). DuPont does not dispute this fact, but does dispute the inferences that can be drawn from it. (D.I. 381 at 11 n.7). Based on the data available, there were three unanimous parallel price increase announcements between 1994 and 2001. (D.I. 312, Ex. 983 at 59). There were a number of other nearly unanimous parallel price increase announcements during this period. (*Id.*). During the Conspiracy Period, there were 31 parallel price increase announcements. (D.I. 286 at 14; D.I. 312, Ex. 983 at 19-31). Valspar argues this increase in frequency is because the "competitors agreed to raise their prices, rather than doing so independently and with no concerted coordination." (*See* D.I. 286 at 14-15 (quoting *In re Flat Glass Antitrust Litig.*, 385 F.3d 350, 355 (3d Cir. 2004))).

Contrary to Valspar's assertion that this departure "is unprecedented and reflects strong circumstantial evidence of conspiracy," this variation in conduct gives rise to no such inference. (*See* D.I. 286 at 14). As the Third Circuit has recently held, "[i]t is generally unremarkable for the pendulum in oligopolistic markets to swing from less to more interdependent and cooperative." *In re Chocolate Confectionary Antitrust Litig.*, 801 F.3d 383, 410 (3d Cir. 2015). In fact, the extent of interdependence within an oligopolistic market "may be either weak or strong and may vary from time to time." *Id.* (quoting Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law* 229 (3d ed. 2010)). In order "[f]or a change in conduct to create an inference of a conspiracy, the shift in behavior must be a 'radical' or 'abrupt' change from the industry's

27

business practices." *In re Chocolate*, 801 F.3d at 410 (quoting *Toys "R" Us, Inc. v. FTC*, 221 F.3d 928, 935 (7th Cir. 2000)).

The evidence presented by Valspar indicates that public announcements of price increases and parallel pricing were not historically uncommon in the titanium dioxide industry. (D.I. 312, Ex. 983 ¶¶ 87-89, figs. 7, 8). The behavior of DuPont and the other defendants is "consistent with how this industry has historically operated." *In re Chocolate*, 801 F.3d at 410. The increased frequency of conduct that was lawful both before and during the conspiracy does not mark a "radical" or "abrupt" change. *Id.* Instead, the record reflects an "unremarkable" swing of the pendulum in an interdependent, oligopolistic market, and therefore does not support a reasonable inference of a conspiracy. *See id.*

### E. Sufficiency of the Evidence

I have carefully reviewed the considered analysis in the Maryland Class Action. *See In re Titanium Dioxide Antitrust Litig.*, 959 F. Supp. 2d 799 (D. Md. 2013). While there is substantially the same record in this case as in the Maryland Class Action, I must reach a different conclusion.[10] In determining whether Valspar can survive summary judgment here, the key question is whether Valspar has advanced sufficient "evidence that would enable a reasonable jury to reject the hypothesis that the defendants foreswore price competition without actually agreeing to do so." *In re Flat Glass Antitrust Litig.*, 385 F.3d 350, 368 (3d Cir. 2004) (quoting *In re High Fructose Corn Syrup Antitrust Litig.*, 295 F.3d 651, 661 (7th Cir. 2002)).

---

[10] The Third Circuit's *Chocolate Confectionary* decision, decided after the Maryland Class Action ruling, is, I think, quite instructive. While it remains clear that careful consideration of the evidentiary record is necessary, it seems to me that *Chocolate Confectionary* might also be understood as suggesting that, in the antitrust oligopoly context, summary judgment cannot be avoided simply by having amassed a significant amount of ambiguous evidence. *See In re Chocolate*, 801 F.3d at 396-97, 397 n.9 ("[A] plaintiff relying on ambiguous evidence alone cannot raise a reasonable inference of a conspiracy sufficient to survive summary judgment." (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 597 n.21 (1986))).

Evidence used to meet that burden of production cannot be "as consistent with interdependence as with a conspiracy," as that does not "tend to exclude the possibility that the [defendants] acted lawfully." *In re Chocolate Confectionary Antitrust Litig.*, 801 F.3d 383, 412 (3d Cir. 2015); *see also In re Text Messaging Antitrust Litig.*, 782 F.3d 867, 879 (7th Cir. 2015) (finding that the plaintiffs had only shown "[t]acit collusion," which is not prohibited by § 1, when they "presented circumstantial evidence consistent with an inference of collusion, but that . . . [was] equally consistent with independent parallel behavior").

In short, Valspar has not satisfied its burden of production. The evidence cited by Valspar demonstrates that the titanium dioxide industry is an oligopoly. That oligopoly may well have caused substantial anticompetitive harm to Valspar. To successfully bring a § 1 horizontal price fixing case, however, there must be evidence of an actual agreement to fix prices. That is lacking here. In alleging an eleven year conspiracy to fix prices, Valspar has failed to obtain any evidence which, while consistent with conspiracy, is not just as consistent with the phenomenon of interdependence which is characteristic of oligopolies. In the oligopoly context, lawful conduct can bear a great resemblance to unlawful conduct. Without evidence that tends to exclude the possibility of independent action, however, Valspar has not presented evidence that creates a dispute as to the material fact of whether there was an agreement. Therefore, I find that summary judgment in favor of DuPont is appropriate.

## V.    CONCLUSION

For the reasons set forth above, defendant's motion for summary judgment (D.I. 239) is **GRANTED**. An appropriate order will be entered.